# In the United States Court of Federal Claims

No. 15-364C
(Filed under seal August 4, 2016)
(Reissued September 7, 2016)†

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                           *
                                           *
INSPACE 21 LLC,                            *     Post-award bid protest; U.S. Air Force
                                           *     launch and test ranges; laches; labor
                                           *     hour reductions; potential increased
             Plaintiff,                    *     workload; potential labor unrest;
                                           *     consideration of minority evaluation
       v.                                  *     opinions; Technical Risk factor;
                                           *     cursory source selection decision; no
THE UNITED STATES,                         *     material change in requirements;
                                           *     satisfactory explanation articulated;
             Defendant,                    *     solicitation provisions followed; SSA's
                                           *     reliance on others' analyses, 48 C.F.R.
       and                                 *     § 15.308.
                                           *
RANGE GENERATION NEXT                      *
LLC,                                       *
                                           *
                                           *
             Defendant-intervenor.         *
                                           *
                                           *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Marcia G. Madsen,* Mayer Brown LLP, of Washington, D.C., with whom were *David F. Dowd*, *Cameron S. Hamrick*, and *Luke Levasseur*, all of Washington, D.C., for plaintiff.

*James P. Connor*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant

---

† The parties were given the opportunity to request redactions, and only intervenor did so. Most of the requests were found to be unwarranted. Order (Sept. 6, 2016). The redacted information has been replaced in this manner: "[XXXX]." The opinion is reissued for publication with several minor, non-substantive corrections.

Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Franklin E. White, Jr.*, Assistant Director, all of Washington, D.C., for defendant.

*Mark D. Colley*, Arnold & Porter LLP, of Washington, D.C., for defendant-intervenor. *Kara L. Daniels, Lauren J. Schlanger,* and *Elizabeth T.M. Fitzpatrick*, all of Washington, D.C., of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

In this post-award bid protest, plaintiff InSpace 21 LLC (InSpace) challenges the United States Department of the Air Force's award of a Launch and Test Range System Integrated Support Contract for Operations, Maintenance & Sustainment (LISC OMS) to defendant-intervenor Range Generation Next (RGNext). Plaintiff argues that the Air Force arbitrarily evaluated the level of risk posed by RGNext's technical proposal --- particularly in the Air Force's treatment of minority opinions of evaluation team members and its assessment of the labor approach and hours proposed by RGNext. Plaintiff has moved for judgment on the administrative record, requesting a permanent injunction and bid preparation and proposal costs. The government and defendant-intervenor have both cross-moved for judgment on the administrative record, arguing that the evaluation of RGNext's proposal was thoroughly and properly performed. For the reasons that follow, the cross-motions of defendant and intervenor are **GRANTED**, and plaintiff's motion is **DENIED**.

## I. BACKGROUND

### A. The Solicitation

The Air Force issued Solicitation No. FA88-11-13-R-001 (RFP or Solicitation), to consolidate three existing legacy contracts into a single LISC OMS contract for fiscal years 2015 through 2024. Admin. R. (AR), Tab 101a at 29013; Tab 101 at 27888; Tab 92b at 27320; Tab 101f at 33054. Previously, separate contracts provided for operations and maintenance of the Air Force's two launch facilities --- the Eastern Range, run from Patrick Air Force Base and launching from Cape Canaveral Air Force Station in Florida; and the Western Range, located at California's Vandenberg Air Force Base. AR, Tab 101 at 27888; Tab 101a at 29020–24. A third support contract sustained the instrumentation for the two ranges. *See* AR, Tab 101 at 27888. The ranges are used to launch military, National Aeronautical Space Administration, and commercial satellites into space, and as test ranges for rockets, missiles, and missile defense. *Id.*

Plaintiff InSpace is a joint venture between PAE Applied Technologies LLC (PAE)[1] and Honeywell Technology Solutions Inc., and intervenor RGNext is a joint venture between Raytheon Technical Services (Raytheon) and General Dynamics Information Technology. AR, Tab 57 at 14323; Tab 58 at 16127; Tab 77.1 at 21732; Tab 101 at 27894–95. Raytheon and PAE were among the incumbent contractors supporting the Eastern Range. *See* AR, Tab 57a at 14336–37; Tab 58a at 16131; *see also, e.g.*, AR, Tab 101 at 28158–62, 28165–66, 28170, 28172, 28174–76, 28178–87, 28565–68, 28571, 28573, 28577, 28582–88, 28590, 28593, 28595–97, 28599.

The Solicitation contained a lengthy Performance Work Statement (PWS) detailing the tasks to be performed under the contract. AR, Tab 101a at 29009–29292. The description of these tasks consumed 170 pages, *id.* at 29025–194, and was organized as follows: Objectives were assigned two-digit paragraph numbers, such as "3.1." *See id.* at 29066. The next level addressed tasks, expressed in full sentences and assigned a three-digit paragraph number. *See id.* at 29067 ("3.1.1. The contractor shall perform program planning to meet user requirements."). Below the task level were more detailed subtasks, with paragraph numbers extending to four or five digits. *See id.* (detailing 3.1.1.1 and 3.1.1.1.1).

A Work Breakdown Structure (WBS) was also employed in the Solicitation. AR, Tab 101a at 29293–300. In the WBS, the Air Force took the third-level tasks from the PWS and reorganized them under paragraphs corresponding to work for the LISC overall, the Eastern Range, the Western Range, "Sustainment," and "Other Support," totaling 109 separate tasks. *Id.* at 29295, 29297–300. The WBS supplied the framework to be used by each offeror in providing its Basis of Estimate (BOE), the staffing levels and skill mix to perform each requirement. *Id.* at 32991. Offerors were required to identify this workload at the three-digit task level, but were free to express workloads according to the more detailed four- or five-digit levels, which would be included in their Contractor Work Breakdown Structures (CWBS). *Id.* at 32993–94.

The Solicitation provided for four evaluation factors, two of which, Technical Capability and Past Performance, were to be rated on a pass/fail basis for acceptability. AR, Tab 101a at 33023. Offerors with acceptable proposals under those two factors would compete for the best value award, which would be based on a tradeoff between the other two factors, Technical Risk and Price. *Id.* Both technical factors were to be evaluated under three subfactors: Operations; Maintenance and Sustainment; and Program Management and Systems Engineering. *Id.* The third subfactor was to be less important than the first two. *Id.*

---

[1] PAE Applied Technologies was formerly known as CSC Applied Technologies Division, LLC. *See* AR, Tab 57a at 14336; Tab 77.1 at 21732.

Technical Risk would be rated as low, moderate, or high. *Id*. The evaluation was to consider "potential for disruption of schedule, increased costs, degradation of performance, the need for increased Government oversight, or the likelihood of unsuccessful contract performance." AR, Tab 101a at 33030. A risk rating would be "[b]ased on the identification of, absence of, or combination of weaknesses or significant weaknesses," although the finding of a significant weakness "will not necessarily generate a 'high' risk rating." *Id*. The presence of a high risk rating for any Technical Risk subfactor would make a proposal ineligible for award. *Id*. at 33020. In the best value tradeoff determination, Price was to be "slightly more important" than Technical Risk. *Id*. at 33023.

Offerors were instructed to submit their proposals in five volumes. AR, Tab 101a at 32972–73. Volume I was to consist of an Executive Summary, no longer than ten pages, and a "Master Table of Content and Cross-Reference Matrix" of unlimited length (and designated as Volume IA). *Id*. at 32973. Volume II, addressing Technical Capability, was to be the basis for the evaluations of both technical factors. *See id*. at 32979. The main volume was to be limited to 150 pages (not counting certain tables), and was to address each of the three technical subfactors. *Id*. at 32973, 32979–90. The first of eight attachments, designated "TC1," would contain the BOEs for each required third-level task, including supporting rationales for, and schedules of, staffing levels and skill mixes. *Id*. at 32991. The rationales were to include summaries of the tasks performed under each element, explanations of labor hour changes from one period of performance to the next, and the methodology used to estimate the hours proposed. *Id*. at 32993. In the instructions, the Air Force provided "baseline" labor hour figures "for informational purposes only," based on the three legacy contracts. *Id*. at 32986. These totaled 3,120,600 hours for performing one year of the work falling under ten PWS objectives. *See id*. at 32986–88. The second attachment to the Technical Capability volume was to contain the Contractor Work Breakdown Structure. AR, Tab 101a at 32973.[2] Volumes III and IV were to cover the other two factors (Past Performance and Price, respectively), and Volume V was for "Contract Documentation." *Id*. at 32973, 32999–3016.

**B. Evaluation of Proposals and Award of Contract**

*1. The Approach to Source Selection*

Under the Source Selection Plan, a large source selection team was assembled. *See* AR, Tab 106 at 34052–53. The ultimate award decision was to be made by the Source Selection Authority (SSA), *id*. at 34038, assisted by two SSA

---

[2] There were six other attachments, TC3 through TC8, which are not relevant to the protest. *See* AR, Tab 101a at 32973.

Advisors and a Source Selection Advisory Council (SSAC) made up of a chairman, four members, and eight advisors, *id.* at 34052–53. The evaluation of proposals was to be performed by a Source Selection Evaluation Board (SSEB), which had a chairman served by seven advisors and three factor chiefs. *Id.* at 34053.[3] Each of the three technical subfactors had an assigned chief, who collectively oversaw the work of six evaluators and eleven advisors. *Id.*[4] The Past Performance Factor Chief was to be served by an evaluator, and an evaluator, two advisors, and three senior advisors were to work for the Price Factor Chief. *Id.* An additional nine people were to have roles in the source selection, bringing the total number involved in the procurement up to fifty-nine. *Id.* at 34052–53. After the SSEB's evaluation of Final Proposal Revisions, the SSAC was to review the evaluations and proposals and prepare a Comparative Analysis Report for the SSA's use in making the source selection decision. *Id.* at 34038–39.

For each technical subfactor criterion and subcriterion identified in the instructions to offerors and the evaluation factors, *see* AR, Tab 101a at 32979–90, 33024–29, an evaluator (or subfactor chief) was assigned to draft the SSEB's assessment of the relevant portion of each proposal, AR, Tab 106 at 34054–55. At least two other members of the SSEB team --- usually SSEB advisors, occasionally evaluators or a subfactor chief --- would also review those portions and provide written comments, using the Electronic Source Selection (ESS) Tool. AR, Tab 101 at 27902; Tab 106 at 34047, 34054–55. The Source Selection Plan provided for the creation and consideration of minority opinions whenever there was "significant disagreement among the SSEB members regarding the evaluation results that should be presented to the SSAC and the SSA." AR, Tab 106 at 34040.

Thus, when an advisor disagreed with the consensus assessment drafted by an evaluator, the advisor could write a minority opinion using the ESS Tool. AR, Tab 101 at 27902–03, 27905, 27913. Both would be reviewed by the relevant subfactor chief, who was charged with the responsibility of preserving comments. AR, Tab 106 at 34041. After discussions with the evaluation team, the subfactor chief would decide on the assessment, with the opposing opinion reported as a minority opinion to the factor chief. AR, Tab 101 at 27913. The same process would then be followed by the factor chief, with the resulting assessment and minority opinion reviewed by the SSEB Chair, who determined the SSEB's position. *Id.* This position, and any minority opinion, would then be reviewed by a Multi-functional Independent Review Team and then by the SSAC, before being reported to the SSA. *Id.* Minority opinions could be generated at any stage of review --- initial evaluations, discussions, or final proposal revision. *See id.* at 27913–18. As a

---

[3] The same person served as chief for both technical factors, and was also the Operations subfactor chief. AR, Tab 106 at 34053.

[4] Two of these advisors (Lee Bridges and Rich Lamb) also served as SSEB advisors.

consequence of this procedure, each assessment received at least five layers of review.

### 2.  Evaluations & Minority Opinions

In addition to InSpace and RGNext, two other joint ventures submitted proposals:  CoRE, a joint venture made up of InDyne, Lockheed Martin, and URS Corp.; and IBL, a joint venture consisting of ITT Exelis, BAE Systems, and L3 Communications.  AR, Tab 101 at 27894.  Taking into consideration the 170 pages of tasks contained in the PWS, *see* AR, Tab 101a at 29025–194, and the ten separate periods of performance, it is no surprise that the proposals were long even by federal procurement standards.  The initial proposal of InSpace totaled about 1,785 pages, AR, Tabs 57a–57e at 14324–6108, mostly contained in Volume II and its attachments (1,039 pages), AR, Tab 57b at 14442–5480.[5]  The RGNext proposal was longer than 1,500 pages, with 827 of them dedicated to the two technical factors.  AR, Tab 58 at 16129–7640.

After the SSEB evaluated the initial proposals, it briefed the SSAC and the SSA in February 2014.  AR, Tabs 66 & 67.  Each of the four proposals was considered "unawardable" at that time because of an unacceptable rating for at least one technical capability subfactor and a high risk rating for at least one technical risk sub-factor.  *See* AR, Tab 67 at 18389; Tab 101a at 33020; Tab 110 at 34160.  The InSpace proposal was found to have 18 weaknesses, 9 significant weaknesses, and 17 respects in which it "does not clearly meet" the minimum requirements of the Solicitation (DNCMs).  AR, Tab 67 at 18389.  The proposal from RGNext was assigned 28 weaknesses, 21 significant weaknesses, and 25 DNCMs.  *Id.*  The CoRE proposal was found to have 49 weaknesses, 12 significant weaknesses, and 28 DNCMs; and IBL's had 28 weaknesses, 24 significant weaknesses, and 35 DNCMs.  *Id.*

Based on the initial evaluations, the SSA established a competitive range containing all four offerors and authorized the contracting officer to enter discussions with each.  AR, Tab 101 at 27913.  Following the Source Selection Plan, AR, Tab 106 at 34045–46, Evaluation Notices (ENs) were issued to the offerors based on their weaknesses, significant weaknesses, DNCMs, and other documented concerns, AR, Tab 101 at 27914; *see* AR Tab 68 (InSpace draft ENs); AR, Tab 69 (RGNext draft ENs).  The Air Force met separately with representatives of each offeror, and received written responses addressing the ENs, which ultimately resulted in all concerns regarding the technical factors being resolved.  AR, Tab 101 at 27919–22.

---

[5]  Nearly 250 pages were taken up by the Master Table of Contents, an index, and a recurring acronym list.

The RGNext ENs corresponding to technical factor issues totaled 42, with another 6 ENs addressing price and 3 dealing with other concerns. *See id.* at 27921. The RGNext responses, AR, Tab 78, resolved all but one of the ENs it had received. *See* AR, Tab 86.7–86.58.[6] Discussions involved a considerable back-and-forth between the Air Force and offerors to satisfy the former's concerns, with some ENs requiring several responses before they were resolved. *See, e.g.,* AR, Tabs 78.5, 78.73, 78.132 (RGNext responses to EN 4); AR, Tab 86.10 (notice closing EN 4).

The Air Force received final proposal revisions from all offerors in September 2014. *See* AR, Tab 94 (InSpace); AR, Tab 95 (RGNext). The SSEB's Proposal Analysis Report (PAR) was signed by the SSEB Chair on October 30, 2014, and submitted for the SSA's consideration. AR, Tab 101 at 28751. The PAR was 864 pages in length, and contained detailed analysis under all four factors. *See id.* at 27888–8751. The longest portions of the report concerned the third technical subfactor, Program Management and Systems Engineering, which totaled 661 pages for the four offerors. *See id.* at 27952–8106 (CoRE), 28148–324 (InSpace), 28365–517 (IBL), 28554–729 (RGNext). All four proposals were found to have the same low Technical Risk rating. *Id.* at 27923–24, 27934, 27950–51, 28106, 28117, 28127, 28147, 28324, 28334, 28346, 28364, 28517, 28527, 28539, 28553, 28729.

The SSAC reviewed the PAR, "unanimously accept[ed] the evaluation results," and issued its Comparative Analysis Report (CAR). AR, Tab 104 at 34024. This report noted that all four offerors' proposals were rated Acceptable for Technical Capability and Past Performance, and Low Risk for Technical Risk. *Id.* at 34026. The SSAC recommended awarding the contract to RGNext based on its total evaluated price of $102,130,178, compared to InSpace's price of $115,502,052. *Id.* at 34026–27. On November 5, 2014, the SSEB briefed the SSA on its final evaluation results, *see* AR, Tab 107 at 34066–139, and the SSAC briefed the SSA on its CAR and award recommendation, *see* AR, Tab 108 at 34142–49. The next day, the SSA issued his Source Selection Decision Document, directing that the contract be awarded to RGNext. AR, Tab 110 at 34161–62.

During the course of the source selection process, three minority opinions concerning RGNext's Technical Risk evaluation were lodged and considered. The first, by an SSEB evaluator, was generated during discussions. AR, Tab 91.37 at 26962–66; AR, Tab 101 at 28741–45. The second, by an SSEB advisor, was raised during the evaluation of final proposals. AR, Tab 103.39 at 33706–08; Tab 103.41 at 33812–13; Tab 101 at 28747–48. The third, by an SSAC advisor, was written in

---

[6] The one unresolved EN, number 53, concerned typographical errors referring to the number of pages contained in certain attachments. AR, Tab 101 at 27921–22; AR, Tab 86.56 at 25741. These were corrected in RGNext's Final Proposal Revision. *See* AR, Tab 95f at 27781–82.

agreement with the second opinion, after the SSAC reviewed the SSEB's final evaluation.  AR, Tab 104 at 34026; Tab 108a at 34151–52; Tab 118 at 34178.

The minority opinion by SSEB evaluator Capt. Kara Jarvis, approved by Program Management and Systems Engineering subfactor chief Robert Aguilar, *see* AR, Tab 91.37 at 26958, 26963, 26967, concerned the evaluation criterion from paragraph 5.2.3.2 of Section M of the Solicitation, *id*. at 26958.  This criterion considered whether an offeror's "[m]anagement approach is consistent with FAR 52.222-41, FAR 52.222-46, and all applicable Collective Bargaining Agreements (CBAs) and successfully manages both union and non-union labor over the life of the contract," AR, Tab 101a at 33027.  Captain Jarvis believed that RGNext's proposal to cross-utilize some employees, and employ others on a part-time basis, did not clearly identify the functions to be performed and whether the personnel involved would be union members.  AR, Tab 101 at 28741–43.  She based a significant weakness on the risks that the proposed approach could result in labor disputes; that part-time employees could be difficult to recruit or retain; and that cross-utilized or part-time employees would not be as proficient as employees who used instruments on a daily basis.  *Id*. at 28744–45.

The SSEB Chair disagreed with the assessment, concluding there was "no reason" to expect a labor dispute or "to believe both full-time and part-time employees can't be certified" as qualified to perform tasks, and finding that part-time employees were "not a significant portion" of the proposed workforce.  *Id*. at 28745–47.  The SSA agreed with the SSEB position, believing any potential labor unrest could be mitigated by using only unionized, full-time employees at a manageable increase in costs.  *Id*. at 28747.  He rejected concerns about part-time employees, noting that the Solicitation did not require offerors to describe how the proficiency of workers would be achieved.  *Id*.

The minority opinion by SSEB advisor Steve Daly addressed Program Management and Systems Engineering evaluation criterion 5.2.3.3.a.  *See* AR, Tab 103.39 at 33706–07.  This criterion determined whether BOEs "contain sufficient staffing levels with an appropriate skill mix to successfully execute the PWS requirements."  AR, Tab 101a at 33027.  The advisor found that, for the PWS tasks he reviewed, RGNext proposed "a 'minimally' sufficient staff with an appropriate skill mix to conduct" these tasks, but nevertheless concluded that "the Offeror's overall staffing level is very low, and they are likely to not be able to meet PWS requirements," warranting a significant weakness.  AR, Tab 101 at 28747.  While recognizing that the proposed "reduction of the current staffing levels by more than a third" was "an allowable level," he was concerned there was a "lack of any margin to compensate for unplanned manning deficiencies across the contract."  *Id*. at 28748.

The SSEB Chair responded to the minority opinion, explaining that the evaluator, the Factor Chief, and he found RGNext's staffing levels to be low risk

because not one of the eleven SSEB advisors who reviewed the proposal, including Mr. Daly, identified any tasks (out of 111 assessed) that were not sufficiently staffed. *Id.* at 28749. Since the BOEs had no weaknesses at the task level, the SSEB Chair believed it was "illogical to conclude" that the tasks could total to an overall level that was deficient. *Id.* He also noted that RGNext's proposed "38% reduction compared to the existing three-contract baseline" was "not a viable discriminator according to the RFP," as the baseline was provided for informational purposes and was not a required level. *Id.*

The purpose of Mr. Daly's minority opinion was to raise the overall staffing level concern to the attention of the Space Wing leadership responsible for launches who were members of the SSAC. AR, Tab 101 at 28748. While no SSAC members agreed with his opinion, AR, Tab 103.39 at 33708; Tab 104 at 34024, 34026 n.1; Tab 108 at 34146, it received the concurrence of an SSAC advisor --- Brigadier General Nina M. Armagno, the Commander of the 45th Space Wing and Eastern Range director, AR, Tab 108a at 34151–52. General Armagno issued her own dissenting opinion, objecting to the contract award to RGNext due to the risk from its "significantly lower level of proposed labor hours when compared to the other offerors." *Id.* at 34151. She also expressed concern that the RFP "significantly underestimated" the number of launches per year, which "compounded" any "underestimation of hours" by RGNext, resulting in a significant weakness. *Id.* at 34152.

During his briefing, the SSA asked General Armagno if she believed the RFP should be amended to address her concerns, and she replied in the negative. AR, Tab 118 at 34178; *see also* AR, Tab 104 at 34026 n.1. The SSAC concurred with the majority opinion concerning staffing levels, finding the minority concerns "areas beyond the requirements stated in Sections L and M of the RFP." AR, Tab 104 at 34026 n.1. The SSA also rejected the minority opinions and "fully supported" the SSEB's majority evaluation. AR, Tab 118 at 34178; Tab 110 at 34161; Tab 103.39 at 33708.

## C. GAO Protest and Contract Performance

InSpace filed a protest with the Government Accountability Office (GAO) on November 24, 2014, challenging the Air Force's evaluation of RGNext's technical risk. AR, Tab 124. A day later, the president of Honeywell Technology Solutions Inc. (HTSI) --- the minority member of InSpace --- wrote to the GAO stating that his company had "not agreed to authorize the filing of this protest in the name of InSpace21." AR, Tab 125 at 34905. According to HTSI's interpretation of a provision of the InSpace operating agreement, a unanimous vote of plaintiff's management board was required to authorize the filing of a bid protest. *Id.* at 34905–06. Since the two HTSI members of the five-person board dissented, HTSI argued that InSpace had chosen not to protest the award, and that majority

member PAE on its own lacked interested party status to bring a protest. *Id.* at 34906.  The GAO dismissed the protest on December 8, 2014, on the ground that InSpace failed to demonstrate it was an interested party in light of the internal dispute concerning the authority to file the protest.  AR, Tab 127 at 34999–5000; *InSpace 21 LLC,* B-410852, *et al.*, 2014 CPD ¶ 363, 2014 WL 7004856 (Comp. Gen. Dec. 8, 2014).  InSpace moved for reconsideration ten days later.  AR, Tab 128.  On January 23, 2015, a court of the commonwealth of Virginia found that the majority vote of plaintiff's managing board was sufficient to authorize the filing of the protest, but the GAO nevertheless denied reconsideration on April 3, 2015.  AR, Tab 132.

In the meantime, with the Competition in Contracting Act stay of performance lifted once the GAO protest was dismissed, *see* 31 U.S.C. § 3553(d)(3)(A)(i), RGNext began performing the 90-day transition period, *see* AR, Tab 101a at 29015.  The transition was completed two days after reconsideration was denied, on April 5, 2015.  App. to Def.'s Cross-Mot. J. Admin. R. and Resp. to Pl.'s Mot. J. Admin. R. at 10.

## D. The Protest in this Court

InSpace filed its protest in our court on April 10, 2015, challenging the award of the contract to RGNext.  Compl.  Plaintiff's initial complaint contained eight separate counts.  Count I contended that the agency "unreasonably disregarded" the minority opinions concerning the riskiness of RGNext's proposal.  Compl. ¶¶ 42–43.  The second count argued that the Air Force did not follow the Solicitation criteria for identifying proposal risks.  *Id.* ¶¶ 45–46.  Count III challenged the evaluation of RGNext's proposed staffing levels and labor rates and argued that the Air Force failed to consider the associated risks to performance, including the potential for increased costs or union work stoppages.  *Id.* ¶¶ 48–59.  The fourth count alleged that the agency provided only a "cursory" look at the Technical Risk factor, ignored the risk posed by a shortened first period of performance, and arbitrarily awarded all contractors a low risk rating.  *Id.* ¶¶ 61–65.  Count V alleged that the agency provided RGNext with an unfair advantage by directing InSpace to increase its staffing levels but not RGNext.  *Id.* ¶¶ 67–69.  In the sixth count, plaintiff alleged the Air Force improperly failed to perform cost realism analysis of cost-based rates.  *Id.* ¶¶ 71–73.  Count VII argued that RGNext "materially underbid the effort" by failing to propose adequate staffing to accomplish certain transition tasks, and should have received a higher risk rating as a result.  Compl. ¶¶ 75–79.  The eighth count asserted that the Source Selection Decision Document was unreasonably brief.  *Id.* ¶¶ 81–86.  Plaintiff sought a permanent injunction requiring a resolicitation or, in the alternative, an award of proposal preparation costs.  Compl. at 35.

On May 1, 2015, the government filed the Administrative Record for this protest. This consisted of 132 tabs of material, several of which contained scores of separate documents. All told, more than 900 documents, totaling 35,057 pages, were included in the record. Pre-solicitation materials made up only about one-quarter of this material, *see* AR, Tabs 1–51, and the Solicitation and its attachments totaled 4,285 pages, AR, Tab 101a. The evaluation of RGNext's proposal included assessments and comments by the SSEB totaling 1,296 pages regarding the initial proposal, AR, Tab 71 at 20346–1641; 388 pages regarding discussions, AR, Tab 91 at 26814–7201; and 470 pages concerning the final proposal revision, AR, Tab 103 at 33552–4022, in addition to more than 200 pages of the PAR, AR, Tab 101 at 28527–738, 28741–49, and more than 400 pages concerning EN responses, AR, Tab 90 at 26391–813.

Eleven days after the Administrative Record was filed, plaintiff filed an amended complaint. While the facts alleged for background purposes were unchanged but for the addition of Administrative Record references, *see* Compl. ¶¶ 1–40; Am. Compl. ¶¶ 1–40, the eight counts were revised, revamped, and even replaced. Count I was fleshed out with considerable detail concerning the minority opinions which plaintiff believes were not reasonably considered. *See* Am. Compl. ¶¶ 44–53, 55–57. The second count focused on the concern expressed in one of the minority reports, and alleged that the evaluation improperly failed to take into account an increase in estimated launches from one of the ranges (which plaintiff characterizes as the "actual workload"). *Id.* ¶¶ 59–61. Count III contended that the Air Force should have analyzed the riskiness of RGNext's proposed reduction in total labor hours relative to staffing under the incumbent contracts. *Id.* ¶¶ 63–65. The fourth count argued that the Air Force misunderstood the extent of RGNext's reliance on part-time workers, and failed to consider the risks associated with that approach. *Id.* ¶¶ 67–70. Count V contained the allegations that were Count II in the initial complaint, concerning the Solicitation's risk criteria. *See id.* ¶¶ 72–73. In the sixth count, plaintiff repeated the alleged union work stoppage risk from the previous third count, and added several specific criticisms of the evaluation of the labor hours proposed by the awardee to perform various PWS requirements. *Id.* ¶¶ 75–88. Count VII is an abbreviated version of the allegations from the prior Count IV. *See* Am. Compl. ¶¶ 90–91. The eighth count is identical to that from the initial complaint, except for one reference to the Administrative Record. *See id.* ¶¶ 93–98. Plaintiff again sought a permanent injunction requiring a resolicitation, but changed its request for proposal preparation costs from an alternative remedy to an additional one. *See* Am. Compl. at 38.

Plaintiff then moved for judgment on the administrative record, followed by cross-motions for judgment filed by the government and intervenor. Plaintiff's briefing and argument tracked the issues in the amended complaint, except that Counts V and VII --- concerning the Solicitation's definition of risk, and whether risk was qualitatively considered --- became more generalized, cross-cutting

concerns.  *See* Pl.'s Mot. J. Admin. R. (Pl.'s Mot.) at 19–20; Pl.'s Resp. & Reply to
Def.'s and Intervenor's Cross-Mots. J. Admin. R. (Pl.'s Reply) at 2–4.  InSpace
argued that the Air Force arbitrarily disregarded the three minority opinions.  Pl.'s
Mot. at 20–24; Pl.'s Reply at 1–2, 4–7.  Plaintiff faulted defendant for not accounting
for potential increases in workload, Pl.'s Mot. at 24–25; Pl.'s Reply at 7–12; for not
considering the riskiness of RGNext's proposed reduction in overall staffing levels,
Pl.'s Mot. at 25–26, 29; Pl.'s Reply at 21–22; and for failing to comprehend the
extent of RGNext's proposed reliance on part-time labor, Pl.'s Mot. at 27–28; Pl.'s
Reply at 12–21.  InSpace argued that the Air Force failed to take into account large
differences between the numbers of hours it proposed to perform various tasks and
those proposed by RGNext, Pl.'s Mot. at 31–33; Pl.'s Reply at 22–25; and failed to
adequately explain why the hours proposed by intervenor were sufficient, Pl.'s Mot.
at 33–35.  Finally, plaintiff maintained that the decision of the SSA was
unreasonable in its brevity and its reliance upon the SSEB's risk ratings.  *Id.* at 35–
36.

The government responded, arguing in its cross-motion that the minority
opinions were thoroughly considered by the other participants in the source
selection.  Def.'s Cross-Mot. J. Admin. R. and Resp. to Pl.'s Mot. J. Admin. R. (Def.'s
Br.) at 22–24; Def.'s Reply in Support Cross-Mot. J. Admin R. (Def.'s Reply) at 3–7.
Defendant contended that it would have been improper for the Air Force to evaluate
the proposals based on criteria that were not included in the Solicitation, including
possible workload changes.  Def.'s Br. at 24–25.  Defendant noted the overall
workload would fluctuate depending on the number of launches planned at a given
time, and offerors were required to submit plans based on an estimated workload.
*Id.*  The government defended the Air Force's assessment of the risk posed by
RGNext's staffing level, *id.* at 26–31; explained in detail the evaluation of
intervenor's proposed use of part-time and cross-utilized labor, *id.* at 31–41; Def.'s
Reply at 12–16; rejected other criticism as mere second-guessing of the evaluator's
judgment, Def.'s Br. at 41–42; Def.'s Reply at 16–18; and argued that the SSA
reasonably relied on the analyses of the SSEB, Def.'s Br. at 42.

In its cross-motion, RGNext defended the Air Force's treatment of the
minority opinions, Def.-Int. [RGNext]'s Cross-Mot. J. Admin. R. and Resp. to Pl.'s
Mot. J. Admin. R. (Int.'s Br.) at 12–33; *see also* Def.-Int. [RGNext]'s Reply Br. in
Support Cross-Mot J. Admin. R. (Int.'s Reply) at 4–5; argued that the Solicitation
workload requirements were properly used in evaluating the risk posed by its
overall staffing levels, Int.'s Br. at 33–37; contended that its proposed use of part-
time labor was reasonably evaluated, *id.* at 37–38; Int.'s Reply at 10–16; argued
that plaintiff's proposed labor hours were irrelevant, Int.'s Br. at 39–41; and
defended the SSEB's evaluation of its proposed labor effort and the SSA's reliance
upon that evaluation, *id.* at 41–48; Int.'s Reply at 17–18.  Intervenor also argued
that the doctrine of laches bars plaintiff's action.  Int.'s Br. at 8–12; Int.'s Reply at
2–4.  Because InSpace did not file its bid protest in our court in December 2014,

after the GAO dismissal and before intervenor began performance, but waited until after intervenor completed the 90-day transition period, RGNext argued that circumstances have changed dramatically.  Int.'s Br. at 10–11.  According to intervenor, that status quo is no longer, and any injunctive relief would be to its competitive prejudice, as well as the government's economic prejudice.  *Id.* at 11–12.  RGNext concluded that dismissal is warranted.

In its reply, InSpace contended that the change in estimated launches to be performed was a material change in requirements that necessitated an amendment of the Solicitation.  Pl.'s Reply at 9–11 (citing, *inter alia*, 48 C.F.R. § 15.206(a)).  Plaintiff also argued against the application of laches, contending that its reconsideration request in the GAO and its state court lawsuit could not properly be equated with sitting on its rights.  *Id.* at 25–28.  The government, in its reply brief, argued that InSpace's argument that the RFP should have been amended was waived, that the change in the estimate of launches was immaterial, and that use of the larger estimate would not have made a competitive difference.  Def.'s Reply at 7–12.  Intervenor made similar arguments in its reply, *see* Int.'s Reply at 7–10, and reiterated its contention that plaintiff's delay in seeking injunctive relief in this court justifies dismissal of the action, *id*. at 2–4.

A lengthy hearing was held on the motions, at which all three parties participated.  This opinion issues after a careful review of the arguments made at the hearing and in the briefs and the authorities cited, as well as a thorough consideration of the pertinent documents in the administrative record.

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  *Judgment on the Administrative Record in a Bid Protest*

Bid protests are heard by this court under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, § 12(a)–(b), 110 Stat. 3870, 3874.  The relevant provision requires our court to follow Administrative Procedure Act (APA) standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections

556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2012).

Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the *de novo* review standard of 5 U.S.C. § 706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards, *see Citizens to Pres. Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 415 (1971). Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. §706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. § 706(2)(A)). *But see Impresa Construzioni Geom. Domenico Garufi v. United States* (*Domenico Garufi*), 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) (also citing 5 U.S.C. § 706(2)(D) as applicable in bid protests). The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when the matter under review was not the product of a formal hearing, *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park,* 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 285–86 (1974). The court must determine whether "the procurement official's decision lacked a rational basis." *Domenico Garufi,* 238 F.3d at 1332 (adopting APA standards the D.C. Circuit developed); *see also Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi,* 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi,* 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi,* 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C. Cir. 1994)). The protester must demonstrate, by a preponderance of the evidence, the absence of any rational basis for the agency decision. *See Overstreet Elec. Co. v. United States,* 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States,* 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States,* 37 Fed. Cl. 771, 779 (1997)), *aff'd,* 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, the court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum,* 404 F.3d at 1351–54.

- 15 -

*2.  Injunctive Relief*

In a bid protest, the court has the power to issue a permanent injunction pursuant to 28 U.S.C. § 1491(b)(2).  In determining whether to grant a motion for a permanent injunction, the court applies a four-factored standard, under which a plaintiff must show: (a) that it has actually succeeded on the merits; (b) that it will suffer irreparable harm if the procurement is not enjoined; (c) that the harm it will suffer, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and (d) that granting injunctive relief serves the public interest.  *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 551–53 (2011).  None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed. Cir. 1993); *AshBritt, Inc. v. United States,* 87 Fed. Cl. 344, 378 (2009).  Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction.  *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,* 908 F.2d 951, 953 (Fed. Cir. 1990).  A lack of success on the merits, however, precludes the possibility of an injunction.  *See Amoco Prod'n Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (explaining that a permanent injunction requires "actual success" on the merits); *Tech Sys., Inc. v. United States,* 98 Fed. Cl. 228, 268 (2011); *Gulf Grp.,* 61 Fed. Cl. at 364.

## B.  The Doctrine of Laches Does Not Bar the Protest

Laches is a discretionary, equitable remedy that may bar a plaintiff's claim if two conditions have been satisfied: (1) the plaintiff has unreasonably delayed bringing a lawsuit to remedy an alleged wrong; and (2) by delaying, the plaintiff has prejudiced the defendant, in the form of either economic or "defense prejudice."  *See JANA, Inc. v. United States*, 936 F.2d 1265, 1269–70 (Fed. Cir. 1991); *Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed. Cir. 1988) (en banc); *Reilly v. United States* 104 Fed. Cl. 69, 78 (2012); *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 73 (2007).

RGNext argues that the two conditions for applying laches are present in this case.  It contends that the four months that elapsed, from the December 8, 2104 dismissal of InSpace's GAO protest to the April 10, 2015 filing of the complaint in this case, were unreasonable.  Int.'s Br. at 10.  And it maintains that this delay, during which the 90-day transition period work was performed under the awarded contract, has resulted in two forms of prejudice --- economic prejudice to the government, which might suffer "termination costs and duplicative transition costs," *id*. at 11; and "competitive prejudice" to RGNext, now that its "competitive,

proprietary processes and approaches" have been implemented and thus revealed, *id.* at 12.

The Court does not find that laches applies in these circumstances. First, plaintiff did not unreasonably delay filing its complaint in our court. InSpace's situation is not comparable to the plaintiff's in *Reilly*, where the four months between GAO denial and the filing of a protest in our court were spent "passively waiting" while an "inter-agency dispute" proceeded. *Reilly*, 104 Fed. Cl. at 80. Here, by contrast, InSpace moved for the GAO's reconsideration within ten days, AR, Tab 128 at 35001, and filed its lawsuit one week after reconsideration was denied.[7] It is not unreasonable for a protester to seek reconsideration of a dismissal by the GAO, and any delay to accommodate the GAO is far from "unexcused." *See Heritage of Am.*, 77 Fed. Cl. at 73 (finding no unreasonable delay when plaintiff filed a bid protest within thirty days of the GAO's reconsideration denial).

Second, intervenor has not identified the sort of prejudice that the laches doctrine was designed to address. No "defense prejudice," such as the loss of evidence or dimming of memories, *see Cornetta*, 851 F.2d at 1378, is involved. Rather, intervenor contends that it will be at a competitive disadvantage should a resolicitation occur, as by performing the contract its proprietary approach is open to other offerors for emulation. Int.'s Br. at 12. But this is an issue to be considered when determining if injunctive relief is warranted, under the balancing of harm factor, *see Elmendorf Support Servs. JV v. United States*, 105 Fed. Cl. 203, 212 (2012), and in any event would be no obstacle to the award of proposal preparation costs. And the economic prejudice that RGNext identifies is not its own potential loss, but the costs to the government of paying for a second transition and for terminating the RGNext contract --- the latter of which would actually be *received* by RGNext. As the government is not attempting to assert a laches defense, its costs are beside the point. *Cf. Res Rei Dev., Inc. v. United States*, 126 Fed. Cl. 535, 549–50 (2016) (holding that harms suffered by non-parties have no bearing on the merits of a protest). For its part, the government asserts that these costs, exacerbated by InSpace's decision to seek GAO reconsideration instead of a preliminary injunction in our court, are relevant to the balancing of harms factor in the injunctive relief calculus. *See* Def.'s Br. at 49–50. Having failed to demonstrate unreasonable delay and prejudice of the economic or defense variety, RGNext's request that the case be dismissed under the doctrine of laches is **DENIED**.[8]

---

[7] Moreover, the GAO protest was filed by InSpace a week after it received its debriefing from the Air Force, *see* AR, Tab 122 at 34226; Tab 124 at 34270, compared to the nearly four-month delay in *Reilly*, 104 Fed. Cl. at 79.

[8] Moreover, although the undersigned has on occasion entertained the laches defense, *see, e.g., Abernethy v. United States*, 108 Fed. Cl. 183, 190 (2012), the Court has serious doubts that it can properly be applied in a case governed by the statute

## C. The Agency's Evaluation and Award Decision Was Rational

### *1. The Air Force Reasonably Considered the Minority Opinions*

Plaintiff argues that the manner in which the Air Force treated the three minority opinions issued by source selection team members was arbitrary.  Pl.'s Br. at 20–24.  In addition to disputing the reasoning contained in and factual bases for the SSA's and the SSEB Chair's discussion of these opinions, InSpace contends that the opinions were "arbitrarily disregarded."  *Id.* at 21.  This latter contention rests on the GAO's decision in *Northrop Grumman Info. Tech., Inc. (NGIT)*, B-400134.10, 2009 CPD ¶ 167, 2009 WL 2620070 (Comp. Gen. Aug. 18, 2009).  But the Court is not persuaded that the evaluation process at issue in this case resembles the one under review in *NGIT*.

In *NGIT*, a solicitation instructed that staffing information would be used to evaluate all subfactors of a technical factor, and the evaluation criterion for a particular subfactor specifically included the demonstrated reduction in personnel. 2009 WL 2620070 at *3–4.  Despite this, the comments of an evaluator of that subfactor concerning staffing efficiencies "were discarded during the consensus process as being not relevant since they addressed evaluation of proposal elements outside of the" particular subfactor.  *Id.* at *6.  The GAO noted that "the agency concede[d] it did not look at the evaluator's negative comments."  *Id.* at *7.  As we will see below, all of the minority opinions were considered and addressed by procurement officials, even if they were found to concern matters beyond the scope of the requirements.  Far from being "discarded," two of them were included in the Proposal Analysis Report, AR, Tab 101 at 28741–45, 28747–48, and the third, generated after the report was written, was addressed in an addendum to the report, AR, Tab 118 at 34178.

### a.  The evaluator's opinion on part-time staffing.

The minority opinion by Capt. Jarvis addressed the evaluation criterion which considers whether a proposed management approach "successfully manages both union and non-union labor over the life of the contract."  *See* AR, Tab 101a at 33027.  She believed that RGNext's proposal "lack[ed] enough detail for the Government to determine the risk of the proposed approach" of using part-time and cross-utilized labor.  AR, Tab 101 at 28741.  She was not certain which tasks were to be performed by these employees, and was concerned that they might operate

_____

of limitations found in 28 U.S.C. § 2501 --- which the Supreme Court has held cannot be *extended* by equitable considerations, *see John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134, 136–39 (2008).

range instrumentation, potentially causing delays or mission failure if a union rejected the approach or if the employees were not adequately trained.  *Id.* at 28742.

To place these concerns in context, three ENs were issued to RGNext concerning the proposed use of part-time and cross-utilized employees.  *See* AR, Tab 69 at 19133, 19149, 19235–36 (draft ENs).  The first, EN 11, noted that the proposed use of part-time workers needed changes to a collective bargaining agreement, and stated that it was "not clear" how many of the "[XXXX] critical employees and [XXXX] remaining employees" would be part-time.  AR, Tab 86.17 at 25650.  The Air Force was "concerned that if the number of part-time personnel is significant," RGNext was "likely to experience mid-term and long-term employee retention issues."  *Id.*  RGNext responded, explaining that none of the [XXXX] employees designated as critical were part-time; that the use of part-time employees "represents less than 4% of the total workforce"; and that the relevant union issued a letter of intent "stating their receptiveness to the approach."  AR, Tab 78.12 at 23018.  The approach was further explained as an efficient means to retain institutional knowledge and provide flexibility.  *Id.*

The other two evaluation notices concerned the transition plan criterion 5.2.3.9.d, requiring "staffing levels sufficient to successfully execute the entire PWS within 90 days from transition start."  *See* AR, Tab 101a at 33028.  One, EN 40, questioned whether the part-time workforce would be "a significant portion" or would be "applied to critical tasks."  AR, Tab 93a.1 at 27522.  The other, EN 41, questioned if RGNext raised its part-time approach with all relevant unions and was concerned that if part-time employees were "a significant portion" of the total, unions might be hesitant to agree, resulting in potential delays or labor disruptions.  *Id.* at 27524.  In response to EN 40, RGNext reiterated that part-time employees were "less than 4% of the total workforce" and were none of the [XXXX] critical staff.  AR, Tab 78.41.  It explained:

> Full-time employees will lead all critical tasks.  Most critical tasks will be completed exclusively by full-time employees.  Some critical tasks may be augmented by part-time employees as individual contributors.  Also, well in advance of every launch, we will [XXXX]; further eliminating uncertainty as to whether RGNext has the necessary manpower to achieve successful contract performance.

*Id.*  The Air Force found that this response satisfied its concern, as "less than 4%" of the workforce was "an insignificant portion," and it appreciated the "additional detail" regarding the performance of critical tasks.  AR, Tab 93a.1 at 27521.  The response to EN 41 explained that only the one union which provided the letter of intent required its agreement to be modified to allow for part-time employees, and that "RGNext has only proposed using part time workers who are represented" by that union, and by one other which has already agreed to the use of part-time staff.

AR, Tab 78.42 at 23108.  This information satisfied the Air Force.  AR, Tab 93a.1 at 27523.

Getting back to EN 11, the Air Force also found that RGNext's response to that notice resolved its concern, as "less than 4% of [RGNext's] total workforce" was found to be "an insignificant portion."  AR, Tab 90.11 at 26497; Tab 93a.1 at 27451.  One SSEB advisor, Lee Bridges, was not satisfied with the response and wanted to issue a follow-up, however, believing that retention issues still needed to be addressed and concerned that the critical tasks in which part-time employees would assist were not specified.  AR, Tab 90.11 at 26505–07.  Captain Jarvis agreed with this suggestion.  *Id.* at 26507.  Another concern surfaced regarding the proficiency of part-time employees.  *Id.* at 26501.  The other advisor reviewing proposals under criterion 5.2.3.2 believed that the union risk issue was resolved, and that proficiency concerns did not come under that criterion.  *Id.* at 26500–01.  The Air Force ultimately determined that the particular issues were not embraced by the RFP and would require an amendment if pursued.  *Id.* at 26500.

The concerns expressed by Advisor Bridges, *see* AR, Tab 90.11 at 26503–04, became the basis for the minority opinion issued by Capt. Jarvis, AR, Tab 91.37 at 26962–66.  The subfactor chief approved of this opinion, expressing a concern that part-time workers might lack the proficiency to hold critical positions, and questioning the attractiveness of part-time work.  *Id.* at 26967.  The factor chief rejected this opinion.  *Id.* at 26966–67.  She found that RGNext adequately addressed concerns regarding the use of part-time employees to support launch operations.  *Id.* at 26966.  The factor chief also pointed out that none of the [XXXX] critical positions would be held by part-time employees, found that RGNext's approach to training and certification of employees adequately addressed any satisfied proficiency issues, and was satisfied with RGNext's relations with the relevant union.  *Id.* at 26967.

The minority opinion was included in the PAR, along with the response of the SSEB Chair and the decision of the SSA.  AR, Tab 101 at 28741–47.  The evaluator did not think the work to be performed by cross-utilized or part-time employees was clearly explained, and was worried about a potential labor dispute.  AR, Tab 101 at 28741–42.  She would have posed to RGNext several questions concerning how cross-utilized and part-time employees would be used, what additional mitigation strategies would be employed in the face of union intransigence, and how the retention and proficiency of part-time workers would be maintained.  *Id.* at 28742–44.

The SSEB Chair considered this opinion, and disagreed with it.  He explained that the SSEB was satisfied with RGNext's response to the EN, as no critical positions would be held by part-time employees; no part-time employees would lead critical tasks; an insignificant 4% of the total workforce was to be part-time; the

part-time workforce was to be trained and certified; and the matter was discussed with the one union whose agreement was necessary to implement the part-time approach.  *Id.* at 28745.  He found there was "no reason to believe" that RGNext's proposed bridge contract with the relevant union would be rejected.  *Id.* at 28746.  And while recognizing that the Solicitation did not require offerors to provide a "plan to achieve and ensure proficiency," the SSEB found that there was "no reason to believe both full-time and part-time employees can't be certified" to operate launch systems.  *Id.*

The SSA approved the SSEB position.  AR, Tab 101 at 28747.  He believed that the concern over labor unrest did not warrant a weakness or worse, as the efficiency resulting from cross-utilization would only increase target cost by 1.1%, which was "well within the contract ceiling price."  *Id.*  He also concurred that the Solicitation did not require offerors to address their plans for worker proficiency, and would not amend the RFP to add such a requirement "because there is no clear standard for ensuring proficiency."  *Id.*

Given this record, the Court is not persuaded that the evaluator's minority opinion was ignored by the Air Force.  Plaintiff argues that the SSEB's determination that a plan to maintain proficiency was not required by the Solicitation resulted in the Air Force not considering how the use of part-time employees would affect launch capability.  Pl.'s Br. at 14.  But the Air Force did consider this, and just disagreed with the minority view.  The factor chief found RGNext's approach to training and certification sufficient for all employees, AR, Tab 91.37 at 26967, and the SSEB Chair found "no reason to believe" that all employees could not be certified under intervenor's approach, AR, Tab 101 at 28746.

InSpace contends that the Air Force's refusal to find a risk associated with the use of part-time employees was based on a failure to appreciate the extent to which RGNext planned to use such employees.  *See* Pl.'s Br. at 16–19.  They focus on the SSEB Chair's statement that only "5.2 FTEs" were "attributed to [RGNext's] skilled augmented workforce part-time efficiency," from which he calculated that there would be "no more than 11" part-time employees.  *See* AR, Tab 101 at 28745; Pl.'s Br. at 13, 21–22.  But even if the SSEB Chair was confusing the positions to be saved as part-time employees were further implemented with the number of people who would hold part-time positions at the outset, the Court does not find this error to be material to the Air Force's decision.  The SSEB Chair also accurately stated that the intervenor was proposing less than 4% of its workforce to be part-time, and also determined that union resistance to the proposal was unlikely.  AR, Tab 101 at 28745–46.  InSpace also cites the SSA's use of a cost estimate of 1.1% to measure the impact of a decision to not cross-utilize employees.  Pl.'s Br. at 22.  While this estimate was apparently limited to cross-utilized employees, *see* AR, Tab 91.39 at 26975, and thus did not include any increased costs if part-time employees were also not used, the Court does not find this fatal to the Air Force's decision.  Plaintiff

has failed to demonstrate whether any cost savings due to the use of part-time employees were built into the RGNext baseline for performing the contract, and given that the labor efforts were expressed in hours, not individuals, *see*, *e.g.*, AR, Tab 58b.4, it is reasonable to conclude that the costs would be the same if performed by full-time rather than part-time employees.

Upon being informed that no critical positions would be held be, nor critical tasks led by, part-time employees, and that no more than 4% of the work was proposed to be performed by them, the Air Force did not believe there was any enhanced risk due to the RGNext approach to staffing. AR, Tab 101 at 28745. It found no reason to believe that there would be union difficulties and no reason to think that part-time and cross-utilized employees would be less proficient than others. *Id.* at 28745–46. This is not an arbitrary decision, but rather a judgment with which some members of the source selection team, as well as InSpace, disagree.[9]

## **b.  The SSEB advisor's opinion on total staffing levels.**

Mister Daly, one of eleven source selection team members who reviewed portions of offers to see if particular tasks were sufficiently staffed under criterion 5.2.3.3.a of the Program Management and Systems Engineering subfactor, *see* AR, Tab 107 at 34081, agreed with the SSEB's Technical Capability determination --- that RGNext's proposal clearly met the Solicitation requirements, AR, Tab 103.39 at 33706; Tab 101 at 28747. He did not identify any weaknesses relating to the individual tasks he reviewed, finding the staffing sufficient and appropriately skilled. AR, Tab 101 at 28747. He contended that a significant weakness should nonetheless be assigned, because RGNext's total staffing levels were less than two-thirds the level of labor performing under the predecessor contracts. *Id.* at 28748. He was of the opinion that this significant weakness was "likely to cause degradation of performance," *id.* at 28747, which would presumably result in a risk rating of High, *see* AR, Tab 101a at 33030.

The Court finds that the Air Force reasonably rejected this minority opinion. The SSEB Chair explained that the Solicitation did not require that offerors meet some minimum, overall staffing level. AR, Tab 101 at 28749. Instead, the hours and skill mix proposed to accomplish each PWS task were scrutinized, and RGNext's BOEs were not found to have any weaknesses or significant weaknesses.

---

[9] The Court notes it might well have been arbitrary had the Air Force found RGNext's proposal to be risky due to the proposed cross-utilization of employees, as the other three offerors proposed cross-utilization and were not subject to such criticism. *See* AR, Tab 66 at 17675 (CoRE), 17677 (InSpace), 17679 (IBL); Tab 101 at 27896–97, 27934, 27949–50, 27954, 27956, 28100, 28104 (CoRE), 27898, 28122, 28127, 28153, 28258 (InSpace), 27900, 28361, (IBL).

*See* AR, Tab 101 at 28527–729. If, under criteria 5.2.3.a, there are found "sufficient staffing levels with an appropriate skill mix to successfully execute the PWS requirements," AR, Tab 101a at 33027, when each requirement is viewed in isolation, it is hardly unreasonable to conclude that the aggregate amount of staffing must also be sufficient and appropriate --- staffing levels are not proposed for their own sake, but to perform the requirements. Contrary to plaintiff's argument, Pl.'s Br. at 23, it was appropriate for the SSEB Chair to find "illogical" the notion that the whole is less than the sum of the parts, AR, Tab 101 at 28749.

The Solicitation did not require offerors to explain why they proposed fewer hours than were used to perform the incumbent contracts. Instead, they were given the aggregate one-year "labor hour baseline[s]" only "for informational purposes," and were to provide their own "manpower levels and skill mixes." AR, Tab 101a at 32986. While offerors were required to explain any changes in staffing from one period of performance to the next, *see id.* at 32993, the Solicitation did not require such an explanation for differing staffing levels relative to the predecessor contracts. And since only aggregate baseline hours were provided, *see id.* at 32986–88, an offeror would not be in a position to know what many of the previous levels were for each task.[10] All each could do was to demonstrate that the levels proposed were sufficient to perform each task --- which RGNext was found to do. Thus, the SSEB properly found that the percentage "reduction compared to the existing three-contract baseline" was "not a viable discriminator according to the RFP." AR, Tab 101 at 28749. The minority and majority views were presented to the SSA, *see* AR, Tab 107 at 34131–32, and he agreed with the majority opinion, AR, Tab 110 at 34161; Tab 118 at 34178. The Court finds that Air Force "articulate[d] a satisfactory explanation for its" disagreement with the views of this individual SSEB advisor. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43.

### c.  The SSAC advisor's opinion on total staffing levels.

After receiving the SSEB briefing, an SSAC advisor agreed with Mr. Daly's minority opinion, and issued one of her own. AR, Tab 108a at 34151–52. She echoed the concern that the 38% reduction in staffing from prior levels presented "significant risk," *id.* at 34151, and was also of the opinion that the Solicitation "significantly underestimated" space launch workload --- based on Fall 2014 projections that there would be 20 launches from the Eastern Range in 2015 and 26

---

[10]  Moreover, a reduction in staffing levels from the predecessor contracts was not viewed by the Air Force as some anomaly to be explained, but was instead one of the benefits of the consolidation. *See* AR, Tab 38 at 4045 (noting expected "cost savings resulting from more efficient processes and manpower utilization"), 4046 (identifying cost savings from "the elimination of duplicative or redundant activities, functions, or organizations").

in 2016, *id.* at 34152.  She did not, however, want the Solicitation to be amended to reflect these concerns.  AR, Tab 103.39 at 33708; Tab 104 at 34026 n.1.

Her views were considered by the SSAC, which accepted the majority assessment of risk and believed the minority opinion was based on matters beyond the Solicitation requirements.  AR, Tab 104 at 34026 n.1.  The opinion was presented to the SSA, who also found it "considered areas beyond the requirements" and "fully supported and approved the SSEB majority assessment."  AR, Tab 118 at 34178.  As was discussed above, the Solicitation did not state that the evaluation of proposals would have anything to do with overall staffing levels proposed, let alone a comparison of these to the effort under the incumbent contracts.  And concerning the workload estimates, the Solicitation required offerors to assume 12–18 launches from the Eastern Range and 10–14 from the Western Range.  AR, Tab 101a at 29226.  The Air Force could not assess proposals based on an offeror's ability to staff 20 or 26 launches from the Eastern Range in a given year, when a maximum of 18 launches was required.  *See Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367–68 (Fed. Cir. 1999); *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 653 (2008); 10 U.S.C. § 2305(b)(1); 48 C.F.R. § 15.305(a).  Thus, the Air Force rationally selected the majority opinion over this minority view.

The plaintiff argues that the SSAC advisor's minority opinion identified a material change in requirements, which would have necessitated a solicitation amendment under 48 C.F.R. § 15.206(a).  Pl.'s Reply at 9–11.  The Court is not persuaded that the potential for two or eight additional launches is material, when the total number of estimated launches that offerors were to staff was thirty-two.  Plaintiff relies on GAO decisions in which the changes were far greater.  For instance, in one case an agency's need for one category of items dropped by 85 percent, *Symetrics Indus., Inc.*, B-274246.3, *et al.*, 97-2 CPD ¶ 59, 1997 WL 529581, at *4 (Comp. Gen. Aug. 20, 1997); and in another, the number of units per shipment to be obtained was reduced by about two-thirds, *CGI Fed. Inc.*, B-410330.2, 2014 CPD ¶ 366, 2014 WL 7185393, at *7–8 (Comp. Gen. Dec. 10, 2014).  By contrast, the 25 percent increase in potential launches is of a far smaller magnitude.  Although the Court concludes that it would not have been proper to assess offerors' ability to staff 34 or 40 launches with the labor hours proposed, when the Solicitation assumed a maximum of 32 launches, the difference was not a material change.  Moreover, plaintiff has failed to demonstrate that the labor efforts proposed would not have been scalable, such that the 6 to 25 percent potential increase in launches could have altered the risk evaluation.

### 2.  The Air Force Properly Based Its Risk Assessment on the Solicitation Requirements

InSpace contends that it was unreasonable for the Air Force to fail to take into consideration the increased estimate of Eastern Range launches that was

mentioned in the SSAC advisor's minority opinion. Pl.'s Br. at 24–25. It also faulted the government for not considering the overall level of staffing proposed by RGNext. *Id.* at 25–26. But as we have just seen, Section II.C.1.b–c, *supra*, the Solicitation required offerors to assume between 12 and 18 launches from the Eastern Range, and contained no requirements or criteria that compared aggregate staffing levels to the levels under the three previous contracts. The Air Force's risk assessment was not arbitrary, but properly followed the Solicitation provisions. *See* 10 U.S.C. § 2305(b)(1); 48 C.F.R. § 15.305(a).

Plaintiff argues that it is a fact that the launch estimates were "significantly underestimated," based on the SSAC advisor's minority opinion. Pl.'s Br. at 24. But that minority opinion itself rested on a factual mistake, as the author thought "[t]he PWS estimated approximately 15 launches per year for the enterprise," AR, Tab 108a at 34152, when the estimate was actually as many as 32 launches from the two ranges, AR, Tab 101a at 29226.[11] In any event, as explained above, the change in estimates was not material, and thus the Air Force was required to evaluate proposals as promised in the Solicitation.

Concerning overall staffing levels, plaintiff seems to be arguing that an offeror which proposes the deepest reduction in staff levels must receive a higher risk rating. The Court is not aware of any precedents for such a proposition, which would undermine the normal incentives (and expected benefits) of competition. *See Arch Chems.*, 64 Fed. Cl. at 400. As the Air Force has determined that there are no weaknesses in the staffing levels and skill mixes proposed for each individual task, it is not arbitrary to conclude that the staffing proposed by RGNext is low risk, regardless of how it compares to the staffing levels of prior contractors.

### 3. The Evaluation of RGNext's Proposed Use of Part-Time Labor Was Not Arbitrary

InSpace contends that the Air Force misevaluated RGNext's proposed use of part-time labor, by failing to understand the extent to which intervenor relied upon the part-time labor force, and failing to question the attractiveness of part-time

---

[11] One flaw in InSpace's argument is its treatment of the SSAC advisor's opinion as constituting facts with which the Air Force decision must be reconciled, rather than an opinion that itself ran contrary to the factual record. In addition to the mistaken belief concerning the total number of launches estimated in the PWS, the author mistakenly thought that RGNext "does not have recent space launch range experience," AR, Tab 108a at 34151; *but see* AR, Tab 58a at 16131. The author also conceded she did "not fully understand" the proposed use of part-time employees. AR, Tab 108a at 34151. Perhaps these errors and uncertainty are why she did not believe that the risk posed by RGNext's proposal was great enough to justify amending the Solicitation.

positions. Pl.'s Br. at 27–28. But as explained above, Section II.C.1.a, *supra*, the Air Force properly based its determination on RGNext's part-time workforce being less than 4% of the total, among other findings. And whether [XXXX] employees would find part-time positions to be attractive is a matter of opinion which this Court cannot second-guess. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). The Air Force's risk assessment regarding RGNext's proposed use of part-time employees was not arbitrary.

### 4.  The Risk Assessment of RGNext's Proposed Labor Hours Was Reasonable

It has long been established that "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). This does not preclude a court from "verifying that objective elements contained in the agency's analysis, such as the description of the offeror's narrative, correspond to the evidence in the record . . . and checking to see if subjective judgments are reached elsewhere in the analysis that contradict the evaluators' conclusions . . . making the decision too 'implausible.'" *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010) (internal citations omitted). But instead of identifying objective inaccuracies or subjective inconsistencies, InSpace's remaining arguments concerning the assessment of the awardee's proposed labor hours focus on the minutiae.

Plaintiff first argues that RGNext proposed "substantially lower" hours than plaintiff itself did, in total as well as in eighteen different areas of tasks. Pl.'s Br. at 29, 31–33; *see also* Pl.'s Reply at 23–25. InSpace calls this a "material discrepancy." Pl.'s Br. at 31. But no authority is provided to support the notion that plaintiff's proposed hours should be the standard for evaluating the proposals of other offerors. InSpace asserts that it was irrational for the Air Force to find its proposal and intervenor's to both deserve a low risk rating, when RGNext proposed fewer hours to perform tasks that constituent parts of both parties had previously performed at the Eastern Range. Pl.'s Br. at 32–33; Pl.'s Reply at 23–24. But while it might be subjectively inconsistent for identical proposal approaches to be rated differently, the same cannot be said of different approaches rated equally. The differences in proposed staffing between InSpace and RGNext provides no basis for finding the Air Force evaluation to be arbitrary.

The rest of InSpace's criticism of the Air Force risk assessment focuses squarely on the minutiae. It complains that "in certain instances" the Air Force, after describing intervenor's proposed staffing for a task, merely stated this was "sufficient." Pl.'s Br. at 33. But when an agency is not finding fault with a particular approach to a task, or noting its superior quality, the Court cannot see how the agency should be required to explain its finding --- that the approach is

merely adequate --- in any detail.[12]  No statute or regulation requires such a process, which would impose high transactions costs on the government with little added benefit --- particularly for procurements like this one, covering more than 100 separate tasks.  *See* AR, Tab 101a at 29293–300.  The PAR amply documents that intervenor's proposal was scrutinized for each required task, and that no problems were found.  *See* AR, Tab 101 at 28527–729.  InSpace similarly faults the Air Force for employing "boilerplate generalizations" in finding staffing sufficient, such as the latter's "professional experience" or "current practices at the Ranges."  Pl.'s Br. at 34–35.  But again, it is not arbitrary for an agency to not provide detailed explanations of the reasons an approach is adequate, unless this subjective judgment can be shown to be inconsistently reached.

Plaintiff also notes particular judgments of the Air Force that it questions, such as tasks for which the evaluators find one FTE to be adequate despite stating that "multiple FTE" were expected, *see* Pl.'s Br. at 34 (citing AR, Tab 101 at 28570), or where the Air Force determined that understaffing of a sub-task could be covered by the resources available at the task level, *id.* at 35 (citing AR, Tab 101 at 28608).  Not only is this the sort of minutiae that a court may not second-guess, *see E.W. Bliss*, 77 F.3d at 449; *Tech. Sys.*, 98 Fed. Cl. at 257–58, but even were a few errors of this sort identified, they would hardly constitute a ground for finding arbitrary the Air Force's 203 page determination that more than 100 tasks proposed to be performed by more than 1000 staff constituted an approach with "little potential to cause disruption of schedule, increased cost or degradation of performance," AR, Tab 101 at 28729.  The risk assessment of RGNext has not been shown to have been unreasonable.

### 5. *The Source Selection Decision Was Not Arbitrary*

InSpace's final argument is that the SSA's decision was unreasonable, because it rested on the allegedly flawed risk assessment of the SSEB, and did not contain any details concerning the proposals other than their identical ratings and their evaluated prices.  Pl.'s Br. at 35–36; *see* AR, Tab 110 at 34159–62.  As we have seen, the Air Force's assessment of risk was not arbitrary.  Plaintiff's complaint is that the Technical Risk factor, which was supposed to be traded-off against the slightly more important Total Evaluated Price, *see* AR, Tab 101a at 33023, ended up being a non-factor due to all offerors receiving the low risk rating.  But instead of being a hallmark of superficiality, this was a vindication of the process followed by the Air Force --- as the extended discussions over the problems identified in ENs

---

[12]  Plaintiff relies on a case in which the agency error was not the failure to explain why an approach was adequate, but rather why nearly identical approaches merited one offeror a "Good" rating but another merely "Satisfactory."  *See Lab. Corp. of America Holdings v. United States*, 116 Fed. Cl. 643, 652–53 (2014).

resulted in the government's confidence that each proposal presented low risk. *See*, *e.g.*, AR, Tab 69; Tab 78; Tab 86.

Under the circumstances, there is nothing improper about the SSA's cursory decision. He is entitled to rely on the analyses of others. 48 C.F.R. § 15.308. In this procurement, that analysis was in the form of a Proposal Analysis Report that was 864 pages in length, AR, Tab 101 at 27888–8751, containing detailed discussion of each PWS task as addressed in each proposal. He also received the views of the SSAC, in the Comparative Analysis Report, AR, Tab 104 at 34023–27, and a briefing, AR, Tab 108. And the SSA had the benefit of a detailed briefing from the SSEB. AR, Tab 107. He was not required to reinvent the wheel, either in evaluating proposals or making a comparative assessment. *See Computer Scis. Corp. v. United States*, 51 Fed. Cl. 297, 320 (2002). The decision document indicates that the SSA "examined each proposal and its evaluation," and he made the uncontroversial decision to award the contract to the lowest-priced offeror, all other considerations being equal. AR, Tab 110 at 34161–62. This decision is certainly reasonable. *See Tech. Sys.*, 98 Fed. Cl. at 265.

## III.  CONCLUSION

For the foregoing reasons, the Court finds that the Air Force's decision to award the LISC OMS contract to RGNext was not arbitrary and capricious, but rather had a rational basis. Plaintiff's motion for judgment on the administrative record is **DENIED**. Defendant and intervenor's cross-motions for judgment on the administrative record are **GRANTED**. The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge